UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 19-cr-10459-RWZ-3 |
| | ) | |
| HECTOR VEGA, | ) | |
| Defendant | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Hector Vega lives in a multi-family household. He cares for four school-aged children, three of his own and one nephew. He wakes them up each weekday, prepares breakfast, and gets them to the school bus. Mr. Vega's partner, Bianca, and sister-in-law, Brittany depend on Mr. Vega to ready the children for school. Mr. Vega's family also counts on his paycheck, which he earns installing drywall.

Hector Vega's family commitments, acceptance of responsibility, and short criminal history lend themselves to a sentence at the low end of the range established by the plea agreement. Mr. Vega requests that the court impose a sentence of 15 months of incarceration, 36 months of supervised release, and a $100 special assessment. This sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

**I.     Rule 11 Hearing**

Hector Vega pleaded guilty on September 15, 2020 to a one-count indictment, charging Conspiracy to Conduct Enterprise Affairs Through a Pattern of Racketeering Activity (RICO Conspiracy), in violation of 18 U.S.C § 1962(d). This plea was entered pursuant to Fed. R. Crim. P. 11(c)(1)(C), with an agreed sentencing range of 15 months to 27 months of incarceration, followed by 36 months of supervised release, a mandatory special assessment of $100, and a waiver of any civil forfeiture challenge.

**II.    Applicable Sentencing Guidelines**

Pursuant to the Plea Agreement (ECF 1232), Mr. Vega and the Government have agreed upon the following guideline calculations:

a) Base Offense Level

- Under USSG §2B1.1, comment. (n.1) and §2A2.2(a), the base offense level is 14 because Mr. Vega is responsible for the aggravated assaults;

- Under USSG §2A2.2(b)(1), the offense level is increased by 2 because the assaults required more than minimal planning;

- Under USSG §2A2.2(b)(3)(A), the offense level is increased by 3 because the victims suffered bodily injury.

b) Aggravating Adjustments

- Under USSG § 3B1.1(c), Mr. Vega accepts a 2-level increase because he was an "organizer, leader, manager, or supervisor in criminal activity other than that described in subsections (a) or (b).

c) Acceptance of Responsibility

- Under USSG §3E1.1(a), Mr. Vega receives a 2-level deduction for "clearly" accepting responsibility; and

- Under USSG § 3E1.1(b), he receives a 1-level deduction for "timely" notification of his intent to plead guilty.

- Mr. Vega's Total Offense Level is 18.

d) Criminal History

- Mr. Vega has zero criminal history points; he falls into criminal history category I.

e) Guideline Range

- The guideline imprisonment range is 15 months to 27 months.

**III. Disagreement with Probation's Guidelines Calculations – "Role in the Offense" Enhancement[1]**

---

[1] Counsel submitted objections to the PSR in two rounds. Probation treated the first round of objections as timely. Probation treated the second round of objections as untimely. The "timely" objections have been memorialized in the PSR. The "untimely" objections have been added as an addendum to the PSR by probation.

2

As part to the plea agreement, the defendant and the government contemplated a 2-level increase based on Mr. Vega's "role in the offense." USSG §3B1.1(c). By contrast, probation categorized the defendant's aggravating role with a 3-level increase. USSG §3B1.1(b). "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." USSG §3B1.1, comment. (backg'd.). In the context of a conviction for RICO Conspiracy, a role-in-the-offense "enhancement is dependent upon the defendant's role in the criminal enterprise as a whole," as opposed to his role(s) in the specific racketeering act(s). United States v. López, 957 F.3d 302, (1st Cir. 2020). "[A] defendant's role in the overarching conspiracy, rather than his role in discrete predicate acts, constitutes the critical benchmark for determining whether a role-in-the-offense enhancement is warranted under section 3B1.1." Id at 308. The unusual leadership structure and limited investigation into the Connecticut branch of the Latin Kings led to an inflated appearance of Mr. Vega's standing within the hierarchy of the Latin Kings organization as a whole. (PSR ¶ 46).

Mr. Vega is one of only two individuals from Connecticut charged in this case. Esther Ortiz, aka "Queen India," is the other. Unlike Mr. Vega, Ms. Ortiz appears to have had a larger role, Crown Council Chairwoman, covering a greater geographic area, the East Coast Region. (PSR ¶28). Notwithstanding the title of Crown Council member attributed to him, Mr. Vega's actual conduct suggests his leadership moniker was inflated (See *Statement of Facts* attached below).

The application notes of the guidelines specifically caution against using titles as controlling evidence of leadership, emphasizing instead factors such as decision-making authority, a claimed right to larger shares of fruits of a crime, the overall scope of the illegal activity, and the degree of control or authority exercised

---

The "untimely" objections consist of challenges to the PSR's "role in the offense" and "grouping" calculations. For purposes of the sentencing, the defendant attaches the "role in the offense" objection to this memorandum (See *Supplemental Objection* attached below). He no longer objects to the PSR's "grouping" calculation.

over others. USSG §3B1.1, comment. (n.4). Within the context of the conspiracy to which he has pled guilty, Mr. Vega occupied a nominal managerial role in just one of a dozen separate branches or chapters, each of which fell under the leadership and supervisory authority of numerous higher-ranking members. (PSR ¶ 22-44).

Although the overall enterprise was large, Mr. Vega's function in it does not reflect the same scale due to the complex internal divisions and his comparatively low role within. "[T]he primary goal in applying §3B1.1 should be to make a "commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." United States v. House, 883 F.3d 720, 724 (7th Cir. 2018). It does not appear, for example, that he had authority or supervisory power over even a single one of his 61 co-defendants. It is clear that, instead, he answered to several of them, including Ms. Ortiz within Connecticut, and also to several identified members of the Massachusetts state leadership structure, such as CW-9. His relatively low level of authority and lack of control over other participants in the enterprise is not in keeping with the type of inflated role meant to be targeted with a three-level sentencing increase under USSG §3B1.1(b).

**IV. The Proposed Sentence of 15 Months Incarceration and 36 Months Supervised Release Is Appropriate Under the Factors Enumerated in 18 U.S.C. § 3553(a).**

Factors to be considered in imposing a sentence are described in 18 U.S.C. § 3553(a). Most relevant here are the nature and circumstances of the offense, the history and characteristics of the defendant, the primary purposes of sentencing, the kinds of sentences available, and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.

### a. Nature and Circumstances of the Offense

Mr. Vega accepted the government's recitation of facts at the Rule 11 hearing (See *Statement of Facts* attached below). Likewise, he agrees with the description of the offense conduct cited in the Presentence Report. (PSR ¶¶ 50A-58). He has admitted and accepted responsibility for his membership in the Latin Kings and for

his participation in the trial of Victim 9 and Philly. He admits to holding Victim 9 in place as other gang members beat Victim 9.

Mr. Vega concedes his central role in the trial of Victim 9 and "Philly." Yet, the punishment decision was made collectively by the crown council. (PSR ¶ 56). Mr. Vega acted as a figurehead, or mouthpiece, for the collective decision of the other members present, and apparently deferred to the leadership of the more highly ranked CW-9. (PSR ¶¶ 55-56). His role in the trial can be distinguished from his role in the beatings; being more involved in the former. He participated in the beating of Victim 9, but did not take part in beating Philly. (PSR ¶¶ 57-58). He held up Victim 9 while he was kicked in the legs, but did not otherwise direct the beatings (in contrast to J. Rodriguez, who took the lead on the beating of Philly and occupied a more defined and higher role in the Massachusetts state leadership as Cacique). (PSR ¶¶ 30, 57). As to the beating of "Philly," there is no evidence that Mr. Vega ever touched him. (PSR ¶ 58). To be clear, Mr. Vega is responsible for the harm that was inflicted upon Philly. He rendered the verdict against the wayward gang member and admitted as much at the Rule 11 Hearing. It is appropriately contemplated in the plea agreement.

Without diminishing the seriousness of the aggravated assaults to which he was involved, Mr. Vega is not been tied to any other violent activities in connection with the Latin Kings; he appears to have been uninvolved in drug production and distribution. The more extensive involvement of members of the New Bedford Chapter in drug activity appears to be an aberration unconnected to Mr. Vega. The government notes that there is no basis to think Mr. Vega played any role in manufacturing or distributing drugs, and that Mr. Vega's knowledge of these activities is limited to the one incident in which he was photographed being at the home of a member who was preparing drugs on his own. (PSR ¶¶17-18 and 61, and fn 6).

    b. **History and Characteristics of Hector Vega**

Mr. Vega has a close and supportive immediate and extended family, including a large network of siblings and half-siblings who occupy an important role in his life. (PSR ¶¶ 111-112). Despite some adolescent instability and difficulty in school, he has maintained close ties with these family members, and found ways to contribute by assuming a caretaker role with relatives, including his grandmother, who suffers from Alzheimer's. (PSR ¶ 112-113, 132, 137). His mother and numerous siblings remain invested in their relationships with him and will be ongoing sources of support. (PSR ¶ 111-112).

His role as a father to his four children is especially important to Mr. Vega. He spends significant time with his 14-year-old son from a prior relationship, caring for him most weekends and participating in his extracurricular activities including youth football, and has managed to effectively co-parent despite a lack of formal custody arrangement. (PSR ¶¶120-122). Mr. Vega is also the primary caretaker for his three younger children and nephew, often providing for them at home to support the work schedule of Bianca, his partner of nine years, and Brittany, her sister. (PSR ¶¶115-118, 137).

Since July, Mr. Vega has been working for a drywall installation company. (PSR ¶ 134). He has worked construction and labor jobs in the past, though in the more recent past, Mr. Vega was the primary caretaker for the children. Since returning to work, Mr. Vega's challenge has been balancing his job schedule with his family's need for him to be a supervising parent. Mr. Vega meets this challenge and complains little. He enjoys the work and loves his family. Mr. Vega hopes to pick up construction work permanently, perhaps in another state, after serving his sentence. (PSR ¶137).

### c. Primary Purposes of Sentencing – Retribution, Deterrence, Sequestration, and Rehabilitation

Mr. Vega accepts society's need to punish him. A 15-month prison sentence achieves that. A long sentence does not necessarily generate a higher return on investment. As to deterrence, the point has already been made. He was held for four (4) months at the beginning of this case. In addition, his family has gone through

6

the discomfort of prosecution, the uncertainty of a sentence, and the negative emotional impact on the children.

Despite being a "gang member," Hector Vega is not inclined to an antisocial lifestyle. To the contrary, he has largely avoided the criminal pitfalls that accompany gang membership. His short record – a "trespass" conviction from 2008 – speaks to that. Likewise, the violent acts in which he participated were controlled and targeted. No civilians were injured. This speaks to the notion that sequestering Mr. Vega from the public is not a necessity. Lastly, Mr. Vega will make use of his time in the bureau of prisons. Not one to sit idly, he hopes to stay busy by taking classes and working.

For those reasons, a prison sentence at the low end of the range contemplated in the plea agreement, followed by 3 years of supervised release, adequately addresses the aims of sentencing.

Mr. Vega may earn up to 54 days of credit a year for "good conduct." 18 U.S.C. §3624. Listed below is a table of potential sentencing scenarios. Column one includes the sentence to be imposed by the court (in months). Column two consists of earned good time (days). Column three reflects the actual time that Mr. Vega would serve if he earns good time (in the aggregate – years, months and days).

| **Sentence in Months** | **Earned Good Time (Days)** | **Actual Time to Serve** |
|---|---|---|
| 15 months | 67 days | 1 year, 0 months, 24 days |
| 16 months | 72 days | 1 year, 1 months, 19 days |
| 17 months | 76 days | 1 year, 2 months, 15 days |
| 18 months | 81 days | 1 year, 3 months, 10 days |
| 19 months | 85 days | 1 year, 4 months, 6 days |
| 20 months | 90 days | 1 year, 5 months, 1 days |
| 21 months | 94 days | 1 year, 5 month, 27 days |
| 22 months | 99 days | 1 year, 6 months, 22 days |
| 23 months | 103 days | 1 year, 7 months, 18 days |
| 24 months | 108 days | 1 year, 8 months, 13 days |
| 25 months | 112 days | 1 year, 9 months, 9 days |
| 26 months | 117 days | 1 year, 10 months, 4 days |
| 27 months | 121 days | 1 year, 11 months, 0 days |

Note: Information in the table above was pulled from the "2019 Good Timetable," prepared by Dan Hesler of the Federal Defender Program in Chicago in 2019.

### d. Kinds of Sentences Available

The parties calculated the guidelines as follows:

- Base Offense Level (USSG §§ 2E1.1(a)(2); 2A2.2)         14
- More than Minimal Planning (USSG §2A1.1(b)(1))          + 2
- Bodily Injury (USSG §2A2.2(b)(3)(A))                     + 3
- Role in the Offense (U.S.S.G. §3B1.1(c)                  + 2
- Acceptance of Responsibility (USSG § 3E1.1(a))           - 2
- Timely Notification of Acceptance  (USSG § 3E1.1(b))    - 1
- Total Offense Level:                                    18

Mr. Vega falls in criminal history category I.

Under the plea agreement, the sentencing range is 15-27 months.

### e. Avoiding Sentencing Disparities

In a case such as this, with many co-defendants entering into plea agreements at different times, the "need to avoid unwarranted sentencing disparities among defendants" who are similarly situated is pronounced. 18 U.S.C. § 3553(a)(6). Although many of Mr. Vega's co-defendants are still awaiting sentencing, some previously imposed sentences bear noting for comparison. Juan Figueroa, who entered into a "(c)" plea with the same agreed sentencing range as Mr. Vega, and whose underlying predicate offense was more serious – shooting a gun at someone (who fortunately was unharmed) – received a sentence of 24 months. (ECF 1541).

Mr. Vega's role as a member of the Connecticut Crown Council should not meaningfully alter the comparison, especially in considering sentences received by other co-defendants who occupied leadership roles. Wilson Peguero, the "Inca" of the Devon Street Chapter, who distributed Fentanyl and ordered a "greenlight" on Victim 19, was sentenced to 30 months (PSR ¶ 35; ECF 1511); Bienvenido Nunez, a member of the Massachusetts state leadership, was sentenced to 18 months (PSR ¶ 29; ECF 1549); and the "Inca" of the Worcester chapter, Alvin Mojica, received a time-served sentence (PSR ¶ 42; ECF 1418).

A sentence at the low end of the range agreed upon in the plea agreement is reasonable here, and a greater sentence may create unwarranted disparities.

V.     Conclusion

Mr. Vega's important family role, his limited participation in the violent acts of the Lating Kings, and his relatively short record are reasons to exercise leniency. Mr. Vega respectfully requests that the Court impose a sentence of 15 months.

Respectfully submitted,
Hector Vega,
By his attorney,

Date: December 20, 2020

/s/ *Henry Fasoldt*
Henry Fasoldt, BBO # 667422
Attorney at Law
185 Devonshire Street, Ste. 302
Boston, MA 02110
henry@bostondefenselaw.com
617-338-0009 – office

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this date, December 20, 2020.

/s/ Henry Fasoldt

# Statement of Facts - 2020.09.15

### HECTOR VEGA, a/k/a "King Demon"

Maximum penalties

Count One: incarceration for 20 years; supervised release for 3 years; a fine of $250,000; a mandatory special assessment of $100; restitution; and forfeiture to the extent charged in the Indictment.

### Elements of the Offense[1]

To find Hector Vega, a/k/a "King Demon" guilty of RICO conspiracy, the government must prove:

*First,* that there was a conspiracy to commit the crime of racketeering—that is, an agreement among two or more persons to conduct the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity.

  a. In this case, the alleged enterprise is the Almighty Latin King and Queen Nation or Latin Kings, as further described in the Indictment.

  b. In this case, the alleged pattern of racketeering activity included acts involving murder under Massachusetts state law (such as murder, assault with intent to murder, attempt

---

[1] Based on *United States v. Leoner Aguirre et al.* (D. Mass.) (Saylor, J.):

> For you to find a defendant guilty of Count 2 [RICO conspiracy], you must be convinced that the government has proved each of the following things beyond a reasonable doubt:
>
> First, that there was a conspiracy to commit the crime of racketeering—that is, an agreement among two or more persons to conduct the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity;
>
> Second, that the defendant knowingly and willfully agreed to participate in that conspiracy; and
>
> Third, that the defendant or another member of the conspiracy agreed to commit at least two racketeering acts.
>
> …
>
> [I]n other words, the government must prove that the defendant agreed to participate in the conspiracy, and that the conspiracy involved, or would involve, the commission of at least two racketeering acts. The government is not required to prove that the defendant agreed to personally commit two racketeering acts or that he actually committed two such acts. However, the government must prove that the defendant intended to further an endeavor that would have satisfied, or actually did satisfy, the requirement of a pattern of racketeering activity.

to commit murder, and conspiracy to commit murder), robbery, witness intimidation and harassment, witness retaliation, and drug trafficking, and other types of racketeering activity as alleged in the Indictment.

*Second*, that the defendant knowingly and willfully agreed to participate in that conspiracy; and

*Third*, that the defendant or some member of the conspiracy agreed to commit two or more racketeering acts. In other words, the government must prove that the defendant agreed to participate in the conspiracy, and that the conspiracy involved, or would involve, the commission of at least two racketeering acts. The government is not required to prove that the defendant agreed to personally commit two racketeering acts or that he actually committed any acts.

See United States v. Leoner-Aguirre, 939 F.3d 310 (1st Cir 2019).

## Statement of Facts

1. At trial, the government would present evidence about the criminal enterprise known as the Almighty Latin King and Queen Nation ("Latin Kings"), whose members have committed racketeering acts and crimes of violence including attempted murder, robbery, drug trafficking, witness intimidation and witness retaliation.

2. The Latin Kings is a nationwide enterprise formed originally in Chicago. The Latin Kings maintains a presence in numerous states with the organization having individual Chapters in various locations and thousands of members. The Latin Kings abide by the King Manifesto and Constitution (KMC) to establish laws, rules, and regulations governing the behavior of its members, which has evolved into a detailed code of organizational and behavioral principles.

3. LATIN KINGS affiliation is demonstrated in a variety of ways. Members display the gang's colors (gold and black) and symbols (a five pointed crown, sometimes worn by a lion) on flags, clothing, and tattoos. When encountering other LATIN KINGS or posing for pictures, members sometimes place their fist over their heart or twist their fingers into the shape of a crown. Additionally, LATIN KINGS often mention "amor de rey," (meaning "love of the king" in Spanish), "amor," or "ADR" in conversation. Typically, these phrases are used at the beginning and end of conversations between members to affirm their commitment to the gang.

4. The LATIN KINGS have a highly organized hierarchical structure at the national, regional, and local levels. The leadership at each level is comprised of an Inca and a team of supporting officers consisting of a Cacique, (or second-in-command), an Enforcer (responsible for maintaining obedience within the membership, executing punishments, coordinating violence against rivals, and maintaining the gang's arsenal), a Treasurer (responsible for the collection of dues, tributes, and fines, and the maintenance of the fundo), and a Secretary (responsible for maintaining records and the administration of the gang's business).

5.    The LATIN KINGS divide the country up into different regions and a "Regional Overseer" acts as a liaison between that region and Chicago, sitting at the head of a "Regional Table" made up of the most senior member of the LATIN KINGS in each state. The regional leadership has a great deal of influence in the selection of the State Team. The "Regional Overseer" can appoint a "Regional Crown Council" and "Regional Enforcer" if he so chooses.

6.    Within most states that "State Team" is comprised of an "Inca," "Cacique," "Enforcer," "Treasurer," and "Secretary" who are charged with ensuring that all local chapters are following the national directives and resolving any conflict that cannot be dealt with at the local level. "State Regional Officers" report on local chapter activities and issues to the "State Team."

7.    Each local chapter is also comprised of an "Inca," "Cacique," "Enforcer," "Treasurer," "Secretary," and other members. In addition, a separate body governs the Department of Corrections and any issues that arise while LATIN KINGS members are incarcerated, and this body reports directly to the "State Team." Finally, there is a "Crown Council" that sits independently and is comprised of a "Chairman," "Vice Chairman," and various "Crown Council Members." The "Crown Council" resolves any issues that cannot be resolved by the state leadership.

8.    The evidence would show that the Defendant was a member of the Connecticut Crown Council. Unlike other states the leadership of Connecticut was comprised of a crown council.  The Defendant was captured on multiple audio/video recordings associating with other members of the Latin Kings, attending meetings, and discussing the business and affairs of the enterprise.  As a member of the crown council, the Defendant was in direct with regional leadership of the Latin Kings, who was positioned above the Defendant on the hierarchy. The Defendant was captured on recording associating with Latin Kings members in New Bedford, MA, and attending various gatherings and meetings.

9.    As captured in recordings, during the period of 2017 through 2019, Victim 9 was a Latin Kings member who was targeted initially for his failure to obtain controlled substances from the sanctioned source. After multiple shootings orchestrated by the Latin Kings, Victim 9 was known to have testified at a state grand jury investigating one of the shootings where Victim 9 was targeted.

10.    In particular, the evidence would show that on September 2, 2019, the Defendant and other members of the Latin Kings, including those from the New Bedford Chapter orchestrated and held a Latin Kings trial for Victim 9, in Meriden, CT. Victim 9 and his associate Philly were brought to an apartment in Meriden, CT, where the gathered members of the Meriden Chapter and New Bedford Chapter were present. A trial was immediately convened to determine the violations of the KMC by Victim 9. This trial was captured on recording.

11.    Ultimately, the Defendant and other Meriden CT members served as judges at the trial because they were seen to not be biased in favor of Victim 9 or the New Bedford members who brought the charges against Victim 9. After hearing testimony of members describing the conduct of Victim 9, and hearing from Victim 9 and Philly. Both Victim 9 and Philly were found

in violation and punishments were ordered by the Defendant and other council members, acting as a body. The punsihments included physical assaults on Victim 9 and Philly by multiple Latin Kings members for a set period. These assaults were captured on video.

       12.     The Defendant participated in one of the assaults, and is captured on video holding up one of the victims of the assaults while other Latin Kings members punch him.

       13.     Based on these facts, the government would prove that the defendant knowingly, voluntarily and intentionally participated in the racketeering conspiracy charged in Count One of the Indictment.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>HECTOR M. VEGA, )<br>Defendant. )<br>) | CRIMINAL NO. 19-CR-10459-RWZ-3 |

# SUPPLEMENT TO DEFENDANT'S OBJECTIONS TO FIRST DRAFT OF PRESENTENCE REPORT

Now comes the defendant, Hector Vega, and hereby supplements his "Objections to the First Draft of the Presentence Report."

In addition to the objections previously raised, Mr. Vega adds the following objection:

1) Page 23, paragraph 85: "**Adjustment for Role in the Offense**: the defendant was a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive; therefore, three levels are added. Vega served in a leadership role on the Crown Council for Connecticut. Vega was also captured on recordings discussing the tenets of the gang and deciding upon and administering physical punishment for violation of its rules." USSG §3B1.1(b).

   Objection: Per the terms of the plea agreement, Mr. Vega and the government agreed upon a 2-level increase for Mr. Vega's "role in the offense." USSG §3B1.1(c).

                                                    Respectfully submitted,
                                                    HECTOR VEGA,
                                                    By his attorney,

Date:  December 9, 2020
Date Modified: December 20, 2020

                                                    */s/Henry Fasoldt*
                                                    C. Henry Fasoldt (BBO# 667422)

185 Devonshire Street  
Suite 302  
Boston, MA 02110  
henry@bostondefenselaw.com